IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:10-CR-0330-TWT-JFK |
| JOSE ANTONIO SANTOS, | |
| Defendant. | |

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Jose Antonio Santos' motion [Doc. 18] to suppress statements made during a secondary border inspection at the Hartsfield-Jackson International Airport on July 18, 2010. An evidentiary hearing was held on the motion to suppress on October 5, 2010.[1] [Doc. 26]. Defendant contends that during that secondary inspection he was subjected to custodial interrogation without being advised of his <u>Miranda</u> rights and that all statements he made should be suppressed.[2] [Doc. 29]. The Government opposes the motion to suppress asserting that Defendant was not in custody requiring <u>Miranda</u> warnings during the secondary

---

[1]Citations to the transcript of the hearing are: (Tr. at ).

[2]Defendant concedes that he was not subjected to a custodial interrogation during the primary border inspection. [Doc. 29 at 6 n.4].

inspection and questioning. [Doc. 30]. After consideration of the totality of the circumstances and the binding legal authority governing analysis of the circumstances, the court finds that Defendant was not in custody and therefore <u>Miranda</u> warnings were not required prior to questioning.

## I. Facts

Concourse E of the Hartsfield-Jackson International Airport ("HJIA") is known as the international concourse at which passengers on flights arriving in the United States from locations outside the United States deplane and proceed through immigration and customs inspection for determination as to admissibility for entry, along with their belongings, into the United States. (Tr. at 4-6, 12, 16, 18-19). The primary responsibility of the officers of the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), is to determine the admissibility of individuals into the United States by reviewing the documents, such as passports and visas, in the passenger's possession, and by determining the identity, intent and purpose of the passenger seeking entry. (Tr. at 4-6, 22, 33-34). All passengers, including United States citizens, are required to go through the primary inspection station, and if referred, to also be further screened at the secondary inspection area. (Tr. at 5, 12-13). Once the primary inspection is completed, a passenger is either

2

admitted into the United States or referred to secondary inspection for further screening. (Tr. at 20-21).

On July 18, 2010, in the evening hours, CBP Officer Robert Dubois was assigned to a primary inspection station at HJIA and encountered Defendant Santos as he presented documents for entry into the United States. Defendant presented a United States Passport, indicating that his place of birth was Puerto Rico and that his name was Alamar Olivera, and a Customs Declaration Form. (Tr. at 3-4, 7-8, 12, 36-37). During the encounter, Officer Dubois asked Defendant routine questions, such as the purpose of Defendant's travel. (Tr. at 7). Defendant responded that he was returning from a three week trip to visit family in Honduras. (Tr. at 7). Because the officer had observed that the passport indicated Defendant's place of birth was Puerto Rico, he wondered why Defendant had visited family in Honduras; so he asked Defendant about his parents' background. (Tr. at 8). Defendant responded that his mother was Puerto Rican but supplied no information about his father. (Tr. at 8).

At this time, Officer DuBois observed that Defendant was "perspiring a lot, [that] he stopped making visual contact, really nervous behavior." (Tr. at 8). Because the officer did not speak Spanish, and he was aware that the native language of Puerto

3

Rico was Spanish, he requested assistance.[3]  (Tr. at 8-9).  Supervising CBP Officer Carmel Suarez, who was born in Puerto Rico and a native Spanish speaker, came over and continued the inspection questioning in Spanish.  (Tr. at 9, 20-21).  According to Officer Suarez, Spanish appeared to be Defendant's native language, and Defendant claimed to be from Puerto Rico.  (Tr. at 21, 24).  Officer Suarez asked Defendant questions about his nationality and his relatives.  (Tr. at 21, 28).  Officer Suarez stated that he asked these questions because Defendant was making an application for admissibility into the United States, as a United States citizen; therefore, the officer needed to determine Defendant's intent and purpose for admission and his identity and nationality.  (Tr. at 21-22, 25, 27).

Defendant, although he spoke little English, claimed that he never lived in Puerto Rico, that his parents were deceased, and that he had relatives living in Puerto Rico and that they lived in the metropolitan area of San Juan, Rio Piedras.  (Tr. at 21, 28-29).  Officer Suarez noted that many false claims of United States citizenship use that location as a place of birth because it is the biggest medical center in Puerto Rico with the most births.  Individuals making false citizenship claims do not know much

---

[3]The interview by Officer DuBois lasted approximately one to one and one-half minutes.  (Tr. at 9-10).

4

otherwise about Puerto Rico.[4]  (Tr. at 29).  Based on Defendant's answers and the officers' observations, Officer Suarez agreed with Officer DuBois' decision to refer Defendant to yellow secondary inspection.[5]  (Tr. at 9, 22).

Officer DuBois advised Defendant that he going to yellow secondary inspection, and after placing Defendant's passport and Customs Declaration into a yellow folder, he escorted Defendant to that nearby location.  (Tr. at 9-10).  The officer did not touch or handcuff Defendant.  (Tr. at 11).  The secondary inspection area is entered through a set of double doors with a seating area for passengers waiting to be called for inspection.  There is also a desk area with screens where the officers work.  (Tr. at 34).  And, to the back, there are a couple of cells and two interview rooms.  (Tr. at 34, 45).  When a passenger is escorted to secondary inspection, he or she is seated in the waiting area, and the folder with the travel documents is placed on a counter.  (Tr. at 35).

---

[4]The interview with Officer Suarez lasted approximately thirty to forty-five seconds.  (Tr. at 22).

[5]During the interview with Defendant at primary inspection, both officers were in uniform, with firearms holstered.  (Tr. at 10, 13-14, 23, 29-30).  The firearms were never drawn nor was Defendant's attention drawn to the firearms by the officers' actions.  (Tr. at 10, 14, 23, 30).  The officers had handcuffs, but Defendant was not handcuffed during the interview or physically restrained or touched in any manner.  (Tr. at 11, 14, 23).  Defendant was never advised that he was under arrest, and he was not threatened.  (Tr. at 11, 23).

5

In the secondary inspection area, the officers seek more details to determine why passengers are coming to the United States and to ensure that the passenger has the right intent for entry and that the purpose of the entry matches the documents presented. (Tr. at 34-36). Not every person referred to secondary inspection is denied admission into the United States, and the determination whether to admit is based on a review of the travel documents, such as, whether the documents belong to the passenger, the intent of the passenger, the purpose for travel, and whether the documents match that information. (Tr. at 31, 35-36).

On July 18, 2010, CBP Officer James B. Smith was working Yellow Document Control Secondary. (Tr. at 32, 34). Another officer had examined Defendant's documents and asked Officer Smith to fingerprint Defendant.[6] (Tr. at 36, 43). Officer Smith was aware that Defendant had presented a passport in the name of Alamar Olivera. (Tr. at 37). When the results of the fingerprinting indicated that Defendant's name was Jose Antonio Santos, Officer Smith escorted Defendant to one of the interview rooms to try to find out who he was.[7] (Tr. at 37, 44, 46, 48). The interview

---

[6] Because Defendant sought admission as a United States citizen, he had not been fingerprinted during primary inspection. (Tr. at 27).

[7] Officer Smith agreed that once the fingerprints came back in another name, he was aware that Defendant probably would not be admitted into the United States. (Tr.

6

room, which is located a few feet from the main secondary area, contained a desk with a computer and several chairs. (Tr. at 37, 45). There are windows looking out to the inspection area. The door to the room remained open during the interview, and Defendant was seated in a chair - closer to the door than Officer Smith. (Tr. at 38-39).

The officer advised Defendant that there was a video camera recording the interview. (Tr. at 38). After explaining to Defendant that everyone has a unique set of fingerprints, he asked the Defendant who he was because his fingerprints matched the name of another person.[8] (Tr. at 38-39). The officer advised that "if [Defendant] can't, you know, tell us the truth, who he is, [we'll] try to find out who he is, it would probably be better for him." (Tr. at 38-39). The officer asked Defendant a few times who he was. Defendant's response was to question why he was being asked those questions because he had shown his passport. (Tr. at 39). After a few minutes, when the officer determined that Defendant was not going to identify himself, the officer stopped the interview and asked Defendant to return to the seating area. (Tr. at 39-40). He did not question Defendant any further. (Tr. at 40-41).

---

at 47).

[8]The officer stated, "We know you're not the same name and person. . . ." (Tr. at 47).

7

During the interview, Officer Smith was in uniform with his firearm visible in his holster. (Tr. at 39). He did not draw or point out the firearm. (Tr. at 40). He also had handcuffs which he did not point out to Defendant, and Defendant was never handcuffed or physically restrained. (Tr. at 40). He did not advise Defendant that he was under arrest. (Tr. at 40). Defendant did not have the option to decline to go to the secondary inspection area or to the interview room. (Tr. at 45). Although Defendant could have left the interview room, if he had, the officer stated that Defendant probably would have been detained in secondary inspection until his identity was determined. (Tr. at 46). Defendant was not advised of his Miranda rights. (Tr. at 46).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

**II.   Discussion**

Although Defendant concedes that he was not in custody requiring Miranda warnings during the primary inspection upon his arrival at HJIA on an international flight on July 18, 2010 [Doc. 18 at 6 n.4], he does challenge the admissibility of the statements that he made prior to receiving Miranda warnings during the yellow secondary inspection based on the claim that he was subjected to a custodial interrogation. [Id. at 6-9]. The Government responds that, given the totality of the

8

circumstances - especially the fact that Defendant was being interviewed at the border by CBP Officers, he was not in custody requiring Miranda warnings.

In Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994) (quoting Miranda, 384 U.S. at 444, 86 S. Ct. at 1612). The Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, __ U.S. __, __, 130 S. Ct. 1213, 1224, __ L. Ed. 2d __ (2010). The Court stated, "We have declined to accord it 'talismanic power,' because Miranda is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" Id. at __, 130 S. Ct. at 1224 (quoting Berkemer v. McCarty, 468 U.S. 420, 437, 104 S. Ct. 3138, 3148-49, 82 L. Ed.

9

2d 317 (1984)).[9]  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" <u>Stansbury</u>, 511 U.S. at 322, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714

---

[9]Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .
>
> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted and emphasis in original); <u>see also</u> <u>United States v. Ellison</u>, __ F.3d __, __, 2010 WL 1493847, at *2 (1st Cir. April 15, 2010) ("in dealing with a case outside the <u>Miranda</u> paradigm [that is, interrogation of a suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody[,]'" the district court explained, "[t]hat is, custody under <u>Miranda</u> means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of <u>Miranda</u>") (quoting <u>Shatzer</u>, __ U.S. at __, 130 S. Ct. at 1224).

(1977) (per curiam)); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[10] Stansbury, 511 U.S. at 323, 114 S. Ct. at 1529; accord United States v. Beltran, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave is irrelevant."); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

And the circumstances before the court fall outside "the Miranda paradigm[,]" that is, interrogation of a suspect at the police station, Ellison, __ F.3d at __, 2010 WL

---

[10]However, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." Stansbury, 511 U.S. at 325, 114 S. Ct. at 1529-30.

1493847, at *2, requiring Miranda warnings. In this case, Defendant was seeking admission into the United States at the functional equivalent of the border, see United States v. Buonsignore, 131 Fed Appx. 252, 257 (11th Cir. 2005), and was being interviewed by CBP Officers as part of their responsibility in protecting the border in connection with that request, see United States v. Garcia-Cordero, 610 F.3d 613, 618 (11th Cir. 2010) (discussing the requirements of 8 U.S.C. § 1324(a)(2)(B)(iii), the "bring and present" regulation, the court agreed with the Government's assertion "that identifying and questioning individuals who enter our country is essential to controlling our borders, which is a critical national security issue"). Although individuals "at the border are entitled to Miranda warnings before custodial interrogation[,]" the court's determination "whether interrogation is 'custodial' should be interpreted in the light of the strong governmental interest in controlling the borders." Moya, 74 F.3d at 1119; accord United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (same).

Given this responsibility, the court in Moya stated:

[S]ome degree of questioning and of delay is necessary and is to be expected at entry points into the United States. Because of this expectation, questioning at the border must rise to a *distinctly accusatory level* before it can be said that a reasonable person would feel restraints on his ability to roam to the "degree associated with formal arrest."

12

> [Minnesota v.] Murphy, [465 U.S. 420, 430, 104 S. Ct. 1136, 1144, 79 L. Ed. 2d 409 (1984)]. We stress that events which might be enough often to signal "custody" away from the border will not be enough to establish "custody" in the context of entry into the country. This idea is consistent with cases involving facts similar to this one, which have indicated that a secondary interview is part of the border routine and does not require Miranda warnings.

74 F.3d at 1120 (citing, e.g., United States v. Henry, 604 F.2d 908, 920 (5th Cir. 1979) ("The referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation and does not, in and of itself, focus on the person so as to require a Miranda warning."), abrogated on other grounds United States v. Corral-Franco, 848 F.2d 536 (1988)); accord United States v. Medina, 167 Fed. Appx. 161, 166 (11th Cir. 2006) (same); McDowell, 250 F.3d at 1362 (same); and see Denson v. United States, 574 F.3d 1318, 1339 (11th Cir. 2009) (preliminary border search may include routine questioning); United States v. Hernandez, 229 Fed. Appx. 331, 332 (5th Cir. 2007) ("Referral to secondary inspection at a border check-point does not constitute an arrest requiring Miranda warnings."); United States v. Masesa, 218 Fed. Appx. 880, 882 (11th Cir. 2007) (finding that both the primary inspection and the secondary inquiry "were part of the initial border investigation[,]" the court stated that "[t]his second phase of the inquiry was merely an extension of the initial border search . . ."); Buonsignore, 131 Fed. Appx. at 258 ("we have held that 'a secondary interview

13

is part of the border routine and does not require Miranda warnings'") (citation omitted).

The courts in McDowell and Moya considered the following factors to determine that the defendant was not in custody when questioned at the border: (1) "he was not physically moved or restrained by officers during the interview," (2) "no handcuffs were employed and no guns were drawn," (3) "he was not booked or told of formal accusations, nor told that he was under arrest" (4) "he did not ask to leave and was not told that he was not free to do so," and (5) "he made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately."[11]  McDowell, 250 F.3d at 1362; see also Moya, 74 F.3d at 1119. Applying these factors to this case indicates that Defendant was not subjected to custodial interrogation during the secondary interview.

---

[11] And, while noting that "there is no fixed limit to the length of questioning[,]" McDowell, 250 F.3d at 1363, the Eleventh Circuit Court of Appeals in both Medina and McDowell found that delays of one and a half hours and approximately four hours, respectively, did not cause the border inquiry to rise to the "accusatory level" requiring Miranda warnings. Medina, 167 Fed. Appx. at 166; McDowell, 250 F.3d at 1363. In this case, Defendant encountered only a minimal delay in his border inspection, a few minutes at primary inspection, a short wait in the yellow secondary area, and then a few minutes during the secondary inquiry. (Tr. at 9-10, 22, 36-37, 40, 42).

14

Defendant was not physically moved or restrained by any CBP Officer during either the primary or secondary inspections. (Tr. at 10-11, 22-23, 39). Although Defendant was not free to leave the inspection area, that fact is true of all deplaning international passengers until the determination is made that the passenger may be admitted into the United States. And passengers referred to secondary inspection may still be admitted. (Tr. at 5-6, 13-14, 16, 20-21, 31, 33-35, 45-46). During the secondary interview, Defendant was seated in an office, with the door open and not closed off from other individuals waiting in the secondary area. (Tr. at 34, 37-39, 45). Defendant was never handcuffed, and the officers did not draw their weapons. (Tr. at 10-11, 23, 39-40). Defendant never asked to leave and never attempted to leave; he was never advised that he was not free to leave. (Tr. at 36-40, 43-47). In fact, although Defendant may have been stopped from leaving the secondary inspection area if he had attempted to do so, he was free to get up and leave the interview room. (Tr. at 45-46). No CBP Officer booked or arrested Defendant or advised Defendant of any formal accusations. (Tr. at 11, 23, 25, 40).

The fact that Defendant was confronted by Officer Smith with the result that Defendant's fingerprints matched a name other than that on Defendant's passport and that he was advised to tell the truth or the officers would have to find out who he was

15

did not constitute a formal accusation of criminal wrongdoing nor did it rise to a "distinctly accusatory level," Moya, 74 F.3d at 1120, of such wrongdoing. (Tr. at 37-39, 46-47). Identifying individuals seeking admission into the United States, which goes hand in hand with determining an individual's intent and purpose for entering the United States, is the primary responsibility of the CBP Officers at the border. (Tr. at 6-7, 20-22, 34-36). And see Garcia-Cordero, 610 F.3d at 618. Asking questions about identity, especially when available and reliable information indicates that the identity provided is in question, is part of the inquiry necessary to make the ultimate determination as to whether Defendant would be admitted into the United States. This is true even if Officer Smith suspected that Defendant would not be admitted given the results of the fingerprinting. (Tr. at 47). More importantly, the fact that Defendant was not restrained or told that he was being detained at the end of the interview with Officer Smith but instead simply advised to return to the general secondary waiting area supports the conclusion that the interview did not equate with custodial interrogation. (Tr. at 39-40).

Finally, Defendant did not make any admissions during the interview which would cause him to believe that he would be immediately arrested. In response to Officer Smith's statements and questions, Defendant questioned why he was being

16

asked those questions because he had shown his passport. (Tr. at 39). And, as noted, at the conclusion of the interview, he returned to the general seating area and was not placed under arrest. (Tr. at 40). Quite simply, questions about Defendant's identity are routine border questions that do not require Miranda warnings. See Buonsignore, 131 Fed. Appx. at 258 (finding that although the defendant was given a secondary examination and asked "the same questions every passenger is asked in secondary examination[,]" the defendant "was not in custody at the time of his secondary examination in a border zone and, thus, Miranda warnings were not required").

Nothing in this record supports a finding that Defendant was subjected to a custodial interrogation during the secondary inspection which would require Miranda warnings. His statements to Officer Smith are admissible.

## III.  Conclusion

For these reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 18] to suppress statements be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

17

**SO RECOMMENDED AND ORDERED** this 7th day of January, 2011.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE